Leta LEVERICH, Plaintiff,

v.

The MUTUAL LIFE INSURANCE COMPANY OF NEW YORK, a Corporation, Defendant.

No. 1285-D.

United States District Court
E. D. Illinois.

March 2, 1956.

Paul M. Wright, Danville, Ill., for plaintiff.

Winston, Strawn, Black & Towner, Chicago, Ill., Acton, Baldwin, Bookwalter & Meyer, Danville, Ill., for defendant.

PLATT, District Judge.

The plaintiff, Leta Leverich, a citizen of Illinois and the beneficiary under a life insurance policy, brings this action to recover double indemnity. The policy was issued July 19, 1928, by the defendant, The Mutual Life Insurance Company of New York, a corporation, and was in full force and effect at the time of the death of William Leverich on May 21, 1953. The Insurer has paid the single indemnity of $10,000. The policy provided:

"The Mutual Life Insurance
Company of New York
Will Pay

to the Insured's wife Leta Leverich the Beneficiary, Ten Thousand Dollars, upon receipt of due proof of the death of William Leverich, the Insured,

or

Twenty Thousand Dollars, upon receipt of due proof that such death resulted from bodily injury effected solely through external, violent, and accidental means, and occurred within ninety days after such injury, all upon the conditions set forth in Section 1.

\* \* \* \* \* \*

"Section 1. Double Indemnity.

"The Double Indemnity will be payable upon receipt of due proof that the Insured died as a direct result of bodily injury effected solely through external, violent, and accidental means, independently and exclusively of all other causes \* \* \*

provided that the Double Indemnity shall not be payable if death resulted * * * directly or indirectly from disease or bodily or mental infirmity.

"The Company shall have the right and opportunity to examine the body and to make an autopsy unless prohibited by law."

The undisputed facts disclose that on April 22, 1953, William Leverich was riding in an automobile driven by Leta Leverich, in St. Petersburg, Florida. A collision occurred with another automobile and the Insured was thrown from the automobile about 15 feet and landed on a concrete sidewalk. He was taken to Mt. Park Hospital in St. Petersburg in an ambulance. An examination made at the hospital by Dr. Paul F. Wallace, a well qualified Orthopedic Surgeon of St. Petersburg, Florida, revealed that Mr. Leverich had a very obvious fracture of his left humerus which was swollen; that there was some bruised blood appearing underneath the surface and there was deformity at the site of the fracture. This arm was approximately five inches shorter than the other arm with a marked angulation at the fracture site giving him a very grotesque deformity. He had multiple abrasions about the head with numerous lacerations, particularly on the forehead. He was in very early surgical shock from the injuries he had received. All of his cranial nerves, and all of his peripheral nerves were found to be intact. There was no evidence of rales in the chest. The main abrasions and lacerations were on the head particularly centered about the forehead where he had a rather severe laceration. X-rays were taken and showed an oblique fracture at the middle and lower third of the humerus. There was a small undisplaced but somewhat comminuted fracture of the right clavicle. The fracture of the humerus showed an overriding of the fragments with moderate medial and anterior angulation. The x-ray of the right ankle was also taken April 22 in its anterior position. It showed some separation of the ankle mortise, which

means that the lower end of the tibia and fibia have been injured allowing some stretching of the ligaments so that they are no longer in their normal proximity. There was no fracture. A long arm cast was applied to the left arm which extended from the palm of the hand to the top of the humerus, as near the shoulder as possible. The lacerations were repaired. The patient was put in bed with a rope around the cast at the elbow directed over the foot of the bed and attached to a weight over a pulley placing his arm in traction. Traction was removed but the cast remained. Mr. Leverich was immediately confined to bed, flat on his back. He remained at the hospital until his death.

For about twelve years prior to the accident Mr. Leverich was afflicted with Parkinson's disease. Mrs. Leverich assisted him in bathing, dressing, and when he ate. He had not driven an automobile for about two years. He had been taking a drug known as Artane to help control his Parkinson's disease, otherwise his physical condition was good and except for osteopathic treatments he had not consulted a physician for approximately nine years. Prior to the accident he was not confused in the morning upon awakening, nor did he have a facial droop.

Pursuant to the provisions in the policy the Insurer obtained an autopsy July 9, 1953. Dr. Dennis B. Dorsey of Danville, Illinois, was the examiner, and it was witnessed by Dr. Herbert Friedman of Carle Clinic, Urbana, Illinois. Both were well qualified pathologists. Dr. Dorsey was employed by the insurance company and Dr. Herbert Friedman by the plaintiff. Dr. Dorsey and Dr. Friedman were in agreement as to the findings which were as follows:

1. Purulent bronchiolitis and bronchopneumonia.

2. Marked dependent congestion and edema of the lungs with focal hemorrhages.

3. Degenerative changes in the basal nuclei of the brain.

4. Fracture of the shaft of the left humerus (ununited).

5. Extensive benign nephrosclerosis.

6. Fatty metamorphosis of the liver.

The defendant maintains that the burden of proof was upon the plaintiff to prove that the death of the insured, William Leverich, met the policy requirements for double indemnity. The defendant further contends that the plaintiff failed to sustain that burden of proof because the evidence disclosed:

"1. That Leverich's death did not result solely from the injuries of April 22, 1953, but was caused by a new, independent and intervening cause in the form of a cerebral vascular accident unconnected with the injuries; and

"2. That Leverich's pre-existing cerebral arteriosclerotic Parkinson's disease and nephrosclerosis was a contributing or co-operative cause of his death."

There is conflicting evidence on the immediate cause of his death and the effect of the pre-existing disease upon his death. Dr. Wallace testified that he visited Leverich every day while in the hospital and that he had serious injuries. His condition, which included cerebral concussion, required complete bed rest. Almost from the start he went steadily downhill. On the 25th of April he took a sudden turn for the worse. On this date he found a little congestion in the lung although his chest was clear on admission to the hospital. Starting on this date he was given penicillin, which is a specific treatment for decreasing congestion in the lungs to prevent pneumonia. Dr. Wallace on the hospital chart stated as his final diagnosis that the underlying cause of death was cerebral vascular accident. He testified that this had been disproved by the autopsy. On cross-examination he said the direct and proximate cause of death was his accident. He further testified that there was nothing to suggest that Leverich was going to die when he did had he not had the accident. Dr. Wallace did not deny that if he hadn't had his previously existing problems the injuries would not necessarily have resulted in his death, even though they were severe. That people at his age everyday who have arteriosclerosis, Parkinson's disease, without such injuries go on and live for another ten or fifteen years. That a man who has had serious injuries, and subsequently dies within four weeks, the accident must be related as the cause of death. He also stated that a person not afflicted with cerebral arteriosclerosis would normally have gotten well.

Dr. Franklin W. Roush, Jr., of St. Petersburg, Florida, a qualified physician also attended Mr. Leverich, starting April 23, 1953, but he did not see him from the 24th of April until the 4th of May. He testified that on April 23 the patient's arm was in a cast and somewhat immobilized; that on that day he checked his heart and general physical condition and that outside of the fracture, abrasions, etc., which he received from the accident his general condition was fairly good. He was in shock, secondary to the accident, and showed Parkinson's disease of some years standing. He seemed to improve one day but relapsed and continued downhill. He was not in condition to be out of bed from May 4 until his death. His critical condition was the outgrowth of the accident. It was his opinion that the cause of the death was a cerebral vascular hemorrhage, and that the existing cerebral vascular arteriosclerosis was definitely a contributing factor to the cerebral accident. Toward the last he evidenced pneumonia which in a situation like this is caused by immobilization. He expressed the opinion that the concussion, shock, etc., incurred at the time of the accident was the primary cause of bringing on the cerebral vascular hemorrhage or accident. In view of the autopsy he stated that he might be wrong as to the cause of death.

Dr. Robert A. Biles of St. Petersburg, Florida, a specialist in internal medicine,

attended Mr. Leverich from April 25 until May 4. He found no evidence of marked shock on the 25th of April but there was some element of cerebral concussion present. He found no change in his condition until May 3 at which time Mr. Leverich became stuporous, offered no response to painful stimuli and showed a marked temperature elevation. That cerebral arteriosclerosis was present. It was his opinion that there was a cerebral vascular accident triggered by the trauma he had suffered. The injuries were incapacitating and incapacitation could lead to complications.

Dr. Dorsey found that the direct cause of death, as appears in the autopsy report, to be "purulent bronchiolitis and bronchopneumonia associated with dependent pulmonary congestion and edema." He came to the "conclusion that similar injuries to a younger and more vigorous individual would not have been fatal." He found "no evidence of an intracranial lesion capable of causing death although there are degenerative changes compatible with a history of longstanding Parkinsonism."

Dr. Friedman testified that there was no evidence of a cerebral vascular hemorrhage which was corroborated by Dr. Dorsey, and that the death was due to pneumonia, which was the result of immobilization in the hospital. The penicillin which was used starting the 25th day of April and continued to within a few days of death stayed the effect of the pneumonia.

The hospital records disclose that the patient's temperature varied and on May 3 reached 106°. Traction was removed from the arm on April 26, position of patient was changed, and he was up in a wheelchair on April 28, 29 and 30 and May 1 and 2. Dr. Wallace explained that this was done to avoid pneumonia. Artane was taken by the patient twice daily but was stopped on May 3. Between the 25th of April and 3rd of May he slept well or fairly well.

With this evidence in mind the applicable law must be examined. In Preston v. Aetna Life Ins. Co., 7 Cir., 1949, 174 F.2d 10, 13, certiorari denied 338 U.S. 829, 70 S.Ct. 80, 94 L.Ed. 504, the policy

> "insured plaintiff 'against loss resulting directly and independently of all other causes from bodily injuries sustained during the term of this Policy and effected solely through accidental means * * *' The policy also contained an exclusion clause reading, 'The insurance under this Policy shall not cover * * * injury * * * or other loss caused directly, wholly or partly, * * * (2) by disease in any form * * *.'"

The facts were that on October 20, 1944, the plaintiff was seated at his desk dictating. He had removed his shoe from his right foot because the foot was sore. He raised his right foot to put it on the desk and struck his toe on either a corner of the desk or a corner of the glass top of the desk. He experienced pain and the toe became black and blue. Gangrene set in and on January 6, 1945, his right leg was amputated below the knee. It was for these injuries that the suit was brought under the policy. From 1941 the plaintiff had a history of pains and discomfort in his right leg and his foot lacked the color of flesh, was numb and cold. For at least a year prior to the accident the plaintiff had received medical treatment for circulatory trouble in the right leg which had been diagnosed as peripheral vascular disease involving chiefly the arteries of the right leg, the underlying cause being arteriosclerosis. By treatment there were intervals when he had no symptoms of pain and the condition of his leg became stabilized. A Doctor in an affidavit stated that the ulcer resulted from the injury to the foot but if the circulation of the foot had been perfectly normal the injury would have healed rapidly. The ulcer was the direct result of the injury but this was modified by adding that the ulcer in all probability would have healed had not the circulatory condition of the foot been impaired. The district court

granted summary judgment for the defendant in accordance with Crandall v. Continental Casualty Co., 179 Ill.App. 330, 335, wherein it was held that there could be no recovery under such a policy where:

"Accidents to persons suffering from pre-existing disease of bodily infirmity, where death results from the accidental injury, and the pre-existing disease or infirmity, acting together * * * results in death."

The court of appeals reviewed the pertinent Illinois law together with Scanlan v. Metropolitan Life Insurance Co., 7 Cir., 93 F.2d 942, which has been cited with approval in many Illinois cases. In the Scanlan case at page 946 the court stated:

"One may recover on an accident policy such as here in issue although the insured suffers from bodily infirmities. If the accident brought about conditions from which death resulted, the fact that the insured was ill, aged or infirm, or had bodily or mental infirmities, would not bar recovery provided the accident excited the bodily infirmity into activity and death resulted. If the infirmity alone would not have caused death, it cannot be said to have caused death when the immediate result was occasioned by an infirmity which became active only because of the accident. The infirmity may have made the insured less able to resist, but if the accident caused the condition which in turn affected the weak spot which did not resist as well as a healthy body, the cause is nevertheless the accident, and recovery cannot be avoided or evaded."

In the Preston case the court held that the weight of authority was in accord with the Scanlan case and other Illinois cases and was the majority rule throughout the country and that the Supreme Court of Illinois would so hold. The judgment for the defendant was reversed and the cause remanded for trial on the merits.

The defendant has cited Fidelity & Casualty Co. v. Weise, 182 Ill. 496, 55 N. E. 540; Wellner v. New York Life Ins. Co., 331 Ill.App. 360, 73 N.E.2d 156; Smith v. Metropolitan Life Ins. Co., 317 Ill.App. 624, 625, 47 N.E.2d 330, which held where the policy required that death occur through external, violent and accidental means and independently of all other causes, the burden of proof was upon the plaintiff to prove that the death occurred within the terms of the policy. It is to be observed that the question of suicide was involved in these cases, and not a pre-existing disease which contributed to death. Suicide is clearly not accidental means.

In Letz v. World Ins. Co., 336 Ill.App. 489, 84 N.E.2d 678, 679, a policy was payable "only in the event of death of the insured from bodily injuries and accident, * * * 'if insured sustains an injury, which independently and exclusively of disease and of all other causes,' results in his death." The court, 336 Ill. App. at page 495, 84 N.E.2d at page 681, said:

"It has been uniformly held in Illinois that where the defendant contended that the death of the insured was contributed to by bodily infirmity or disease, that such contention was an affirmative defense and that the defendant must prove that the death was from this cause."

And again, 336 Ill.App. at page 497, 84 N.E.2d at page 682, the court stated:

"The courts of Illinois uniformly hold that where the deceased was suffering from a bodily infirmity, or may have been suffering from the same, at the time of the accident, that it is a question for the jury as to whether the insured died as a result of the bodily injuries, directly and independently from all other causes, and solely through external, violent and accidental means."

This court again cited, 336 Ill.App. at page 499, 84 N.E.2d at pages 682, 683 and approved the Scanlan case. It is not

necessary in this case to determine on whom the burden of proof was placed.

 The plaintiff has proved by a preponderance of the evidence that Mr. Leverich died "as a direct result of bodily injury effected solely through external, violent and accidental means, independently and exclusively of all other causes," and that death did not result "directly or indirectly from disease or bodily or mental infirmity." This court is convinced, although the Insured had Parkinson's disease, that it did not cause the death. Prior to the accident Leverich was in good physical condition for a man of his age with the exception of this disease. Dr. Wallace testified a person afflicted with Parkinson's disease at Leverich's age could continue to live ten or fifteen years. On April 22, 1953, the accident happened and Leverich received severe injuries. He died May 21, 1953. From the greater weight of the evidence it must be concluded that Leverich died of pneumonia. The autopsy proved this. The pathologists, Dr. Dorsey and Dr. Friedman, agreed that death resulted from pneumonia. The autopsy gave no evidence of a cerebral vascular accident. In Dr. Friedman's opinion pneumonia was the result of immobilization in the hospital. There was other medical testimony that immobilization caused pneumonia. Dr. Biles corroborated this when he testified that the injuries were incapacitating and incapacitation could lead to complications. At Dr. Wallace's direction penicillin was administered to the patient upon rales being noted in the chest. While Dr. Wallace and Dr. Roush expressed the cause of death as a cerebral vascular accident both admitted that they might be wrong in view of the findings at the autopsy. The injuries received at the accident required hospitalization. These injuries were so severe there was immobilization which resulted in pneumonia which in turn caused the death. The facts fall within the rule allowing recovery as set forth in Crandall v. Continental Casualty Company, supra:

"Second. Accidents that cause the death of a person, suffering from disease or bodily infirmity, which had no causal connection with the death; * * *."

None of the evidence justifies a reasonable inference that Parkinson's disease was an independent and intervening cause of death.

 Assuming that the cause of death was a cerebral vascular accident nevertheless the plaintiff should recover because the facts would then be identical with the Scanlan and Preston cases. If Parkinson's disease was a contributing cause of death, it is no defense. It is conclusive that without the injuries received in the accident the cerebral arteriosclerosis would not have been excited into activity causing a cerebral vascular accident resulting in death. It was Dr. Wallace's opinion that the accident must be related to the death. Dr. Roush expressed it, that the concussion, shock, etc., incurred at the time of the accident were primarily the cause of the cerebral vascular hemorrhage. Dr. Biles said the cerebral vascular accident was triggered by the trauma Leverich suffered. On this theory of the evidence it is clear that the infirmity, Parkinson's disease, which Leverich had may have made him less able to resist as well as a person without cerebral arteriosclerosis, but it was the accident which caused the condition which in turn affected the weak spot causing death. No other conclusion can be reached on this theory of the evidence. Whether the death resulted independently of Parkinson's disease or if Parkinson's disease contributed to the death, the plaintiff must recover.

Therefore, the plaintiff should have a judgment for $10,000. Plaintiff may submit findings of fact, conclusions of law and appropriate order.